DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

KAREN BEAUSEY (CABN 155258)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6598
    FAX: (415) 436-7234
    Karen.Beausey@usdoj.gov

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>     Plaintiff, )<br><br>     v. )<br><br>A. Approximately 15,602 Ether (ETH) and .16 )<br>Bitcoin (BTC) seized by law enforcement on or )<br>about December 14, 2017; and )<br>B. Approximately 199.71841508 BTC, )<br>$6,164,994.22 USD and 1199.00 NEO seized )<br>by law enforcement on or about August 23, )<br>2019; )<br><br>     Defendants. )<br>_____ ) | CASE NO.<br><br><br>**VERIFIED COMPLAINT FOR FORFEITURE** *IN REM* |

     The United States of America, by its attorneys, David L. Anderson, United States Attorney, and

Karen Beausey, Assistant United States Attorney for the Northern District of California, brings this

complaint and alleges as follows:

## NATURE OF THE ACTION

     1.    This is a judicial forfeiture action, as authorized by Title 18, United States Code, Sections

981(a)(l)(A) and (C), 981(b), and 982(a), involving the seizure and forfeiture to the use and benefit of the

United States of America the following property:

      a.      Approximately 15,602 Ether (ETH) and .16 Bitcoin (BTC) seized by law enforcement on or about December 14, 2017 and currently in the custody of the United States Secret Service ("USSS") (the "December 14, 2017 Funds"); and

      b.      Approximately 199.71841508 BTC, $6,164,994.22 USD and 1199.00 NEO seized by law enforcement on or about August 23, 2019 and currently in the custody of the USSS (the "August 23, 2019 Funds");

(hereinafter, collectively, the "Defendant Property"), as property constituting, or derived from, any proceeds of 18 U.S.C. §371 (Conspiracy), 10 U.S.C. § 1030(a)(4) (Computer Hacking), 18 U.S.C. §1344 (Bank Fraud), and 18 U.S.C. §1343 (Wire Fraud), and property involved in violations of 18 U.S.C. § 1956 (Money Laundering), and thereby forfeitable pursuant to 18 U.S.C. §§ 981(a)(l)(A) and (C), 981(b), and 982(a).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355.

3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395 because the acts or omissions giving rise to the forfeiture occurred in this district and the Defendant Property is located in this district.

4.      Intra-district venue is proper in the San Francisco within the Northern District of California.

## PARTIES

5.      Plaintiff is the United States of America.

6.      The Defendant Property consists of:

      a.      15,602 Ether (ETH) and .16 Bitcoin (BTC) seized by law enforcement on or about December 14, 2017 and currently in the custody of the USSS; and

      b.      199.71841508 BTC, $6,164,994.22 USD and 1199.00 NEO seized by law

enforcement on or about August 23, 2019 and currently in the custody of the USSS.

## APPLICABLE LAW AND TRACING METHODOLOGY

7.      Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1) provides for civil and criminal forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, 1957, or 1960, and any property traceable to such property.

8.      Title 18, United States Code, Sections 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting a "specified unlawful activity" or a conspiracy to commit such offense. Title 18, United States Code, Sections 1956(c)(7) and 1961(1) define specified unlawful activity to include computer hacking, bank fraud, and wire fraud, in violation of Title 18, United States Code, Sections 1030, 1343, and 1344. Title 28, United States Code, Section 2461, provides for criminal forfeiture where the civil forfeiture of property is authorized.

9.      Title 18, United States Code, 1030 makes it a crime knowingly (1) to exceed authorized access to a computer of a financial institution; (2) with the intent to defraud; (3) where such access furthered the fraud; and (4) the defendant obtained property worth more than $5,000.

10.     Title 18, United States Code, Section 1343, makes it a crime to knowingly execute, or attempt to execute a scheme or artifice to (1) obtain money or property by means of false or fraudulent pretenses, representations, or promises; (2) that are material; (3) with the intent to defraud; and (4) where the defendant used, or caused to be used, a wire communication to carry out or attempt to carry out an essential part of the scheme.

11.     Title 18, United States Code, Section 1344, makes it a crime knowingly to execute, or to attempt to execute, a scheme or artifice to (1) obtain money or property by means of false or fraudulent pretenses, representations, or promises; (2) knowing the statements were false; (3) where the statements

were material; (4) the defendant acted with the intent to defraud; and (5) the victim was a financial institution.

12.     Title 18, United States Code, Section 1956(a)(1) makes it unlawful (1) to conduct or attempt to conduct a financial transaction; (2) with the proceeds of a specified unlawful activity; (3) knowing the transaction involved the proceeds of criminally derived property; (4) with the intent to promote the specified unlawful activity or to evade taxes, or knowing the transaction was designed to avoid reporting requirements or to conceal the nature, source, location, ownership, or control of those proceeds.

13.     Pursuant to 28 U.S.C. § 1355(b), a forfeiture action may be brought in any district court where any of the acts giving rise to the forfeiture occurred, even as to property located in a foreign jurisdiction.

14.     One of the chief goals of forfeiture is to remove the profit from crime by separating the criminal from his or her dishonest gains. *See United States v. Newman*, 659 F.3d 1235, 1242 (9th Cir. 2011); United States *v.* Casey, 444 F.3d 1071, 1073 (9th Cir. 2006). To that end, if property appreciates in value or earns interest, any appreciation or interest is subject to forfeiture. *See United States v. Betancourt*, 422 F.3d 240, 250 (5th Cir. 2005); *United States v. Hawkey*, 148 F.3d 920, 928 (8th Cir. 1998).

## BACKGROUND REGARDING COMPUTERS, THE INTERNET, AND E-MAIL

15.     The term "computer," as used herein is defined in 18 U.S.C. § 1030(e)(1), includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

16.      Special Agent (SA) Andrew Foss with the Department of Homeland Security, United States Secret Service ("USSS"), and has been so employed since July 2015. The USSS is the primary

investigative agency charged with safeguarding the payment and financial systems of the United States. SA Foss is currently assigned to the San Francisco Field Office as a member of the Electronic Crimes Task Force (ECTF). He attended and completed the twelve-week Criminal Investigator Training Program at the Federal Law Enforcement Training Center located in Glynco, Georgia, and an eighteen-week USSS Special Agent Training Course at the James J. Rowley Training Center located in Beltsville, Maryland. These programs included comprehensive, formalized instruction in, among other things: fraud investigations, counterfeit identification and detection, familiarization with United States fraud and counterfeit laws, financial investigations and money laundering, identification and seizure of assets, physical and electronic surveillance, and undercover operations. SA Foss has also received specific instruction in the investigation of electronic crime, included but not limited to network intrusions, point of sale terminal compromises, computer hacking, account takeover schemes, bank fraud and wire fraud. As part of this instruction, he received training related to identifying the techniques and methods employed by the groups and organizations involved in these types of crimes.

17.     During his time in federal law enforcement, SA Foss has participated in criminal investigations related to the unlawful takeover of financial accounts, counterfeit currency, business email compromise scams, romance scams and pump and dump schemes. He has requested the issuance of subpoenas, 2703(d) court orders, search warrants and Mutual Legal Assistance Treaty (MLAT) orders for individuals associated with fraud based criminality. He has also executed seizure warrants for real property associated with fraud based electronic crimes.

18.     In addition to his training and experience, SA Foss has consulted with other experienced agents who have had training in the investigation of computer-related crimes. Based upon his training and experience and his consultations with other experienced agents SA Foss knows the following:

a.     The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities. In order to access the Internet, an individual

computer user must subscribe to an access provider, which operates a host computer system with direct access to the Internet. The world wide web ("www") is a functionality of the Internet which allows users of the Internet to share information;

   b.   With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world. This connection can be made by any number of means, including modem, local area network, wireless and numerous other methods; and

   c.   E-mail is a popular form of transmitting messages and/or files in an electronic environment between computer users. E-mail is often the preferred medium for international communication in much, if not most, of the business world. E-mail is instantaneous, the communication is committed to writing, and differences in times zones matter less due to the fact that the e-mail recipient does not have to be physically present at work when the e-mail message is sent.

   d.   When an individual computer user sends e-mail, it is initiated at the user's computer, transmitted to the subscriber's mail server, and then transmitted to its final destination. A server is a computer that is attached to a dedicated network and serves many users. An e-mail server may allow users to post and read messages and to communicate via electronic means.

   19.   With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world. Many individual computer users and businesses obtain their access to the Internet through businesses known as Internet Service Providers ("ISPs"). ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISP's servers; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP.

   20.   The ISPs maintain records pertaining to the individuals or companies that have subscriber accounts with the ISP. Those records may include identifying and billing information, account access

information in the form of log files, e-mail transaction information, posting information, account application information, Internet Protocol addresses, and other information both in computer data format and in written record format.

21.    A "web page" is an electronic document, typically written in plain text in computer language known as Hypertext Markup Language ("HTML") and recognizable by most computers capable of accessing the Internet. In many cases, a web page is publicly accessible by anyone with a "web browser" and Internet access. A "web site" is a collection of related web pages, images, videos, or other digital assets with a common "domain name" or "Internet Protocol" ("IP") address.

22.    "Internet Protocol" (or "IP") is the method by which data is sent from one computer to another on the Internet. An IP address is a numerical label assigned to a computer or device that is participating in an IP network. The IP address, in most cases, is assigned by a central authority and identifies the location of the computer or server on which the data sought is located. In sum, a "name" indicates what we seek; an "address" indicates where it is; a "route" indicates how to get there.

23.    For various reasons, people can obfuscate the IP address of the server on which their data resides, and thus render information derived from the IP address inaccessible to the public. This is done through Domain Name System ("DNS") Forwarding. DNS Forwarding results in the display of a forwarder's server as the target IP address, rather than the server on which the data actually resides. When queries for a web page are received, they are internally and privately forwarded to another IP address, normally without any notice or indication to the viewer. Information related to the actual IP address of a web site is only available through a legal request, such as a subpoena.

### BACKGROUND REGARDING BITCOIN AND ETHEREUM

**BITCOIN**

24.    Bitcoin (BTC) is a form of decentralized, convertible cryptocurrency that exists through

the use of an online, decentralized ledger system. While Bitcoin mainly exists as an Internet-based form of currency, it is possible to "print out" the necessary information and exchange Bitcoin via physical medium. The currency is not issued by any government, bank, or company, but rather is generated and controlled through computer software operating via a decentralized network. Bitcoin is typically acquired by purchasing them from a Bitcoin seller or "exchanger." It is also possible to "mine" Bitcoin by verifying other users' transactions. Bitcoin is just one form of cryptocurrency, and there are a significant number of other varieties of cryptocurrency.

25.     Bitcoin exchangers typically accept payments of fiat currency (currency which derives its value from government regulation or law), or other convertible digital currencies. When a user wishes to purchase Bitcoin from an exchanger, the user will typically send payment in the form of fiat currency, often via bank wire or ACH, or other convertible cryptocurrency to an exchanger, for the corresponding quantity of Bitcoin, based on a fluctuating exchange rate. The exchanger, often for a commission, will then typically attempt to broker the purchase with another user of the exchange that is trying to sell Bitcoin, or, in some instances, will act as the seller itself. If the exchanger can place a buyer with a seller, then the transaction can be completed.

26.     When a user acquires Bitcoin, ownership of the Bitcoin is transferred to the user's Bitcoin address. The Bitcoin address is somewhat analogous to a bank account number, and is comprised of a case-sensitive string of letters and numbers amounting to a total of 26 to 35 characters. The user can then conduct transactions with other Bitcoin users, by transferring Bitcoin to their Bitcoin addresses, via the Internet. Bitcoin address clustering is a process that attempts to de-anonymize a user by identifying all of the addresses that they control.

27.     Little to no personally identifiable information about the payer or payee is transmitted in a Bitcoin transaction itself. Bitcoin transactions occur using a public key and a private key. A public key is used to receive Bitcoin, and a private key is used to allow withdrawals from a Bitcoin address. Only

the Bitcoin address of the receiving party and the sender's private key are needed to complete the transaction.  These two keys by themselves rarely reflect any identifying information.

28.     Digital currencies, including Bitcoin, have many known legitimate uses.  However, much like cash, Bitcoin can be used to facilitate illicit transactions and to launder criminal proceeds, given the ease with which Bitcoin can be used to move funds with high levels of anonymity.   As is demonstrated herein, however, in some circumstances Bitcoin payments may be traced to accounts at traditional financial institutions using the blockchain.

**THE BLOCKCHAIN**

29.     All cryptocurrency transactions are recorded on what is known as a "blockchain;" essentially a distributed public ledger that keeps track of all of a particular virtual currency's transactions. For example, the Bitcoin blockchain keeps track of all Bitcoin transactions, incoming and outgoing, and updates approximately six times per hour.  The Bitcoin blockchain records every Bitcoin address that has ever received a Bitcoin and maintains records of every transaction for each Bitcoin address.

**ETHEREUM**[1]

30.     Ethereum (ETH) is a cryptocurrency that is open source, public, has a blockchain, and is distributed on a platform that uses "smart contract"[2] technology.  The public ledger is the digital trail of the Ethereum blockchain which allows anyone to track the movement of ETH.  Smart contracts allow developers to create markets, store registries of debts, and move funds in accordance with the instructions provided without any type of middle-man or counterparty controlling a desired or politically motivated outcome.  Smart contract technology is one of Ethereum's main selling points and an important tool for companies or individuals executing trades on the ETH blockchain.  The ETH platform allows developers

---

[1] https://ethereum.org

[2] Smart contracts are computer protocols that automatically enforce a pre-arranged negotiation between individuals conducting a transaction.  These protocols are also sometimes called self-executing contracts.

to build and deploy software and decentralized applications using the blockchain protocol. The ETH blockchain protocol allows smart contracts to operate without fraud, censorship, or third party interference.

### FACTS

**SUMMARY**

31.     SA Foss is investigating a large scale, sophisticated "phishing" campaign that took place from at least June through October 2017, targeting cryptocurrency exchanges. "Phishing" is a technique that uses websites or emails appearing to be a legitimate website/email but is not. To phish successfully, the false URL or email address often has a letter missing or added (for example, "www.polonex.com" versus "www.poloniex.com"). In this case, the attackers purchased and deployed multiple websites that appeared to be the legitimate cryptocurrency exchange. When users logged into these fraudulent websites the attackers would steal their user IDs and password information. Once the attackers captured these credentials, they executed account takeovers of the victim users' accounts at the legitimate exchanges and drained the users' accounts of some or all of their cryptocurrency, including Bitcoin, Ether and other cryptocurrencies, resulting in large losses for the users.

32.     Three cryptocurrency platforms attacked as part of the phishing scheme included Poloniex[3], Binance[4], and Gemini Trust Company LLC ("Gemini")[5]. The three attacks against these platforms netted the perpetrators in excess of $20 million worth of virtual currency.

33.     The USSS determined that the co-conspirators used fictitious user accounts at another

---

[3] Poloniex is headquartered in Wilmington, Delaware. Poloniex's virtual currency platform is hosted by the web hosting service Cloudflare, which is located in San Francisco, CA. All users who hold accounts at the Poloniex platform are required to login through the main website, https://poloniex.com, which SA Foss has identified as hosted by Cloudflare in San Francisco, CA.

[4] Binance is a cryptocurrency exchange platform that was originally based in Hong Kong, China, and is currently headquartered in the Cayman Islands. At least one victim was identified as residing in San Francisco, California.

[5] Gemini Trust Company, LLC (Gemini) is a cryptocurrency exchange platform based in New York, New York. Some of the funds from the Gemini thefts were intermingled with funds from the Poloniex and the Binance thefts.

cryptocurrency exchange, Bittrex, to receive funds stolen as a result of the scheme. Through blockchain analysis, USSS determined that BTC stolen from Poloniex accounts was deposited into the 1Q9UA BTC "cluster." The 1Q9UA BTC "cluster" is the name given to a group of 558 BTC addresses that are likely controlled by the same individual. Between August 10, 2017 and September 19, 2017, 435.88 BTC were sent from cluster 1Q9UA to the fictitious Bittrex accounts of: (1) A.C.[6] (61 BTC); (2) E.S. (225.88 BTC); and (3) W.W. (149 BTC), through various intermediary cryptocurrency addresses. Most of this BTC was then converted to ETH and transferred out of the exchange. The USSS has determined that Danil Potekhin and Dimitrii Karasavidi conspired together to perpetrate the fraud scheme.

34.    Most of the proceeds from the Poloniex attacks were frozen by Poloniex on or about October 30, 2017 (when Poloniex discovered the intrusion), and seized via seizure warrant on or about December 14, 2017 by the USSS (the December 14, 2017 Funds).

35.    The USSS examined the blockchain and tracked the stolen cryptocurrency that was not frozen by Poloniex, and the stolen cryptocurrency from the attacks on Binance and Gemini, and learned that the lion's share was eventually deposited into a deposit address at an account at Bitfinex, another cryptocurrency exchange. The USSS identified Dimitri Karasavidi as the owner of that recipient Bitfinex account. This additional stolen cryptocurrency was seized from Karasavidi's account on August 23, 2019 (the August 23, 2019 Funds).

**POLONIEX THEFT ATTACK**

36.    Poloniex identified 158 user accounts breached in the above-described manner beginning on at least August 5 and 23, 2017 (the "Poloniex Theft Attack")[7]. USSS identified Danil Potekhin as controlling multiple similarly spelled domains to that of Poloniex (www.poloniex.com), including: (1)

---

[6] Throughout this document, initials and redacted email addresses are used in place of the full names and email addresses of the account holders in order to protect the identity of individuals whose identities were stolen or otherwise used without their knowledge or consent.

[7] 155 of the accounts were victims of the Poloniex Theft Attack. An additional three accounts were breached in furtherance of the Poloniex Manipulation Attack discussed below.

pollonilex.com;  (2) poloneliex.com;  (3) poloniex24.com;  (4) poloniexcenter.club;  (5) poloniexcenter.site;  (6) poloniexservices.site;  (7) poloniexsolutions.club;  (8) poloniexsolutions.site;  (9) poloniexworld.club;  (10) poloniexworld.site;  (11) poloniliex.com;  (12) polonnliex.com;  and (13) polonilex.com.   Each of these domains was established between July 17, 2017 and October 29, 2017.   The investigators believe these sites were phishing sites and that they were advertised on Google and appeared as a top hit if someone searched for the website for Poloniex.   Using these fake websites, Potekhin induced at least 158 victim customers of the Poloniex exchange platform, including Poloniex customers in the Northern District of California, to access the fake Poloniex domains, causing the victim customers to input their user identification and passwords in order to access their Poloniex accounts. This enabled Potekhin and others to obtain the customers' user identification and passwords without authorization.

37.     Prior to the attacks, the attackers created a set of fictitious Poloniex accounts (the "Five Fictitious Accounts") using the names of other individuals.   The attacker profiles included:  (1) N.B.; (2) C.A.; (3) A.C.; (4) A.S. (email address – w******w*******659@yahoo.com);  and (5) G.B.[8] The suspects then used fictitious user accounts at Bittrex to receive funds stolen as a result of the scheme. Using the account breaches the perpetrators stole at least two million dollars' worth of BTC and ETH (about $700,000 USD in Bitcoin and $1,300,000 USD in ETH).

38.     BTC stolen from Poloniex accounts was deposited into the 1Q9UA BTC "cluster." Thereafter, between August 14, 2017 and September 27, 2017, 435.88 stolen BTC was sent from the 1Q9UA BTC cluster to the fictitious accounts of at least (1) A.C.; (2) E.S.; and (3) W.W. at Bittrex. Most of this BTC was then converted to ETH and transferred out of the exchange.  As discussed below, in a sophisticated and layered manner Karasavidi received the lion's share of the stolen funds from the Poloniex Theft Attack in his Bitfinex account.

---

[8] These Poloniex accounts were created between June 8, 2017 and July 17, 2017, just before the thefts occurred.  According to the British authorities, the passport photos at Poloniex for several of the accounts, including A.C.,, N.B., and C.A., . do not match those individuals' legitimate photos.  Thus, USSS believes the identities of these individuals were stolen.

## POLONIEX MANIPULATION ATTACK

39. In late October 2017, the suspects also used cryptocurrency in Poloniex victims' accounts to trade in volatile cryptocurrency markets (the "Poloniex Manipulation Attack"). One victim (who had about $5 million worth of cryptocurrencies in his account) had his cryptocurrency used to trade in GAS. GAS is the token used to pay the cost of execution on the NEO blockchain. NEO, formerly called as AntShares, is China's first open source blockchain platform. For this scheme, the suspects created nine fictitious Poloniex accounts, placing approximately 300 GAS cryptocurrency throughout eight of them.

40. On October 29, 2017, the suspects logged into the GAS victim's account and used the funds in the account to purchase approximately 8000 GAS. This purchase drove the price of GAS up dramatically. Poloniex confirmed that as a result, eight of the nine fictitious Poloniex accounts benefitted from a 13,000% increase in the price of GAS. On the same day, the suspects converted the GAS in the eight attacker accounts into approximately 16,362 ETH (a total of 0.16 BTC remained in the accounts as well). This high-volume sale of GAS caused the value of GAS to decline precipitously. Indeed, one victim (who began the day with approximately $5 million worth of cryptocurrency in his account) lost virtually all of his $5 million in cryptocurrency. It is worth noting that after December 2017 cryptocurrency valuations skyrocketed, and the victim lost that potential profit as well.

41. Some of the funds in the attacker accounts were transferred to other accounts, but some of those funds were frozen by Poloniex after it detected the intrusion. On December 14, 2017, the Honorable Elizabeth D. Laporte, United States Magistrate Judge for the Northern District of California, authorized a seizure warrant for all funds contained in the frozen attacker accounts (17-CR-17661 EDL). The warrant was executed on that date, resulting in the seizure by the USSS of approximately 15,602 ETH and .16 BTC (the December 14, 2017 Funds).

## BINANCE THEFT ATTACK

42. From approximately December 19, 2017 to March 2, 2018, Binance was targeted in a

phishing scheme similar to the one that occurred at Poloniex (the "Binance Theft Attack"). This phishing scheme led to a loss of approximately 566 BTC. The stolen BTC was valued at approximately $10,061,000 on December 19, 2017. There were over 142 victims of the Binance Theft Attack. The stolen funds were dispersed into one BTC cluster and at least 17 additional cryptocurrency addresses. At least one victim was identified as residing in San Francisco, California.

43.     As set forth below, funds from the Binance Theft Attack were comingled with funds from the Poloniex Theft Attack and funds from the Poloniex Manipulation Attack, and eventually deposited into Karasavidi's cryptocurrency account at Bitfinex.

**GEMINI THEFT ATTACK**

44.     Approximately 42 customers of Gemini suffered theft attacks from on or about October 24, 2017 through at least November 1, 2017, using the same phishing scheme used in the Poloniex attacks, including a victim from the Northern District of California who had 25 ETH stolen from her account. Gemini reported that as a result of the phishing scheme, approximately $456,000 in United States Dollars (USD), 85.47 Bitcoin (BTC) (with approximate value of $522,000), and 671.40 Ether (ETH) (with an approximate value of $198,000) was stolen, primarily from customers in the United States. The total value of stolen USD, BTC and ETH was approximately $1,176,000, based on the average valuation between October 24 and 31, 2017.

45.     Based upon victim reporting to Gemini, the attackers used fake Gemini domains that were accessed either by searches on Bing and Google, or through ads placed on Bing and Google, to steal the Gemini victims' credentials. This is the same manner and means used in the attacks on Binance and Poloniex. Several fake domains were created around the time of the attack, some of which are linked to Potekhin. Funds stolen during the Gemini Attack were comingled with cryptocurrency from the Poloniex Theft Attack, the Poloniex Manipulation Attack and the Binance Theft Attack before it was ultimately funneled to Karasavidi's Bitfinex account.

### MOVEMENT OF STOLEN CRYPTOCURRENCY FROM POLONIEX, BITTREX, AND BINANCE ATTACKS TO KARASAVIDI'S BITFINEX ACCOUNT

46.     USSS traced approximately 763 ETH in proceeds from the Poloniex Manipulation Attack (approximately 759 ETH from the eight fictitious Poloniex Manipulation Attack attacker accounts and approximately 4 ETH from the ninth fictitious attacker account that did not buy GAS[9]) that were transferred before Poloniex was able to freeze the accounts. As set forth below, through blockchain analysis, the USSS determined that much of these proceeds from the Poloniex Manipulation Attack were transferred to Karasavidi.

47.     Through blockchain tracing analysis, the USSS determined that Karasavidi received at least 2679 of stolen Ether (probably more)[10] from the Poloniex Theft Attack, the Poloniex Manipulation Attack, the Binance Theft Attack, and the Gemini Theft Attack. Specifically, between August 14, 2017, and November 7, 2017, $1.3 Million in stolen Ether was transferred out of victim Poloniex accounts to a number of intermediary accounts. Approximately $200,000 worth of Ether obtained through the Poloniex Manipulation Attack was also transferred to a number of intermediary accounts during that same timeframe. And between October 24, 2017 and November 1, 2017, 729.11 ETH stolen from 23 victim Gemini accounts was deposited into various intermediary accounts. Between March 11, 2018, and April 15, 2018, this Ether was ultimately transferred to Karasavidi's account at Bitfinex Cryptocurrency Exchange. As the intermediary addresses were used to transfer the funds, the addresses were often emptied. The multiple transfers through these addresses were used to conceal the nature, ownership and origin of stolen funds prior to Karasavidi's receipt of them.

48.     Insert 1 is an illustration of the routes the stolen ETH took prior to being deposited into Karasavidi's account at Bitfinex.[11]

---

[9] The amounts listed may be rounded numbers and are not accurate to the decimal.

[10] Via Blockchain analysis the investigating agents traced at least 2679 stolen Ether to Karasavidi but that Ether was comingled with and laundered through over 4800 additional Ether.

[11] Additional transfers of stolen ETH were also made to Karasavidi's Bitfinex account on March

1



Insert 1

22

23   *Tracing of Proceeds from Poloniex Theft Attack to Karasavidi's Bitfinex Account*

24      49.    Insert 2 is a detail of Insert 1. As explained below, it depicts the movement of Ether from

25   the Poloniex Theft to Karasavidi's Bitfinex account and illustrates Karasavidi's use of multiple or

26

27

28   18, 2018 and April 15, 2018, so the total amount of stolen ETH deposited into Karasavidi's account was
     actually greater than illustrated in Insert 1.



"layered" transactions to move illegal proceeds to his Bitfinex account:



a.  Between August 14, 2017 and September 15, 2017, Poloniex Theft Attacker G.B.'s account made 11 deposits (totaling approximately 409 ETH) into address 0xd69.  (Once there, it was co-mingled with other stolen funds that had been transferred from the Bittrex account of A.C. (*see* A).)

b.  Subsequently, on August 24, September 1, and September 17, 2017, address 0xd69 transferred a total of 4015.43 ETH to address 0xf36.  Address 0xf36 already had a balance of ETH at the time.  The address was subsequently drained as a result of two transfers: one, in the amount of 5015 ETH, that dissipated most of the ETH in the address; and a second, on November 16, 2017, which transferred the remaining 362.56 ETH to address 0x27b, where it was co-mingled with other funds.

c.  On the same day (November 16, 2017), after receiving the 362.56 ETH from address 0xf36, address 0x27b made two transfers that, as with address 0xf36, left the address empty.  The first transfer dissipated most of the ETH in the address.  The second, in which address 0x27b sent 335.96 ETH to address 0xe02 (where it was co-mingled with Ether from the Poloniex Manipulation Attack and the Bittrex accounts of E.S. and W.W. (*see below and* Insert 1, Item B)) emptied all remaining funds from address 0x27b.

d.  Also on November 16, 2017, address 0xe02 then sent 5050 ETH to address 0x271.  The ETH remained in 0x271 until January 16, 2018, when 0x271 received additional ETH from P.K., a Binance Theft Attacker (*see below and also* Insert 1, Item C).

e.  The combined contents of address 0x271 remained there until April 9, 2018, when 1916 ETH was sent from to address 0x899.  Once there it was co-mingled with other ETH from the Poloniex Manipulation Attack (*see* Insert 1, Item D).

f.      The same day (April 9, 2018), address 0x899 was emptied when 5000.16 ETH was transferred into address 0xd88.  Address 0xd88 is the ETH deposit address for Karasavidi's account at Bitfinex.

50.      In the same "layered" manner, Karasavidi received stolen funds from the Poloniex Theft Attack.  Stolen BTC from the Poloniex Theft Attack victims was sent to BTC cluster 1Q9UA.  As graphically depicted on Insert 1:

a.      From August 10, 2017 – September 19, 2017, 435.88 BTC was then sent from cluster 1Q9UA to the Bittrex accounts of (1) A.C.; (2) E.S.; and (3) W.W.  All three accounts converted this BTC to ETH.

b.      As noted above, A.C.'s account sent 3606.33 of this converted ETH to address 0xd69, where it was co-mingled with ETH from G.B.'s Poloniex Theft Attack account before being routed through various addresses to Karasavidi's Bitfinex account (*see* Insert 2).

c.      Using the same sort of layering, stolen BTC from the Poloniex Theft Attacks were also transferred to Karasavidi through E.S.'s and W.W.'s Bittrex accounts.  As seen on Insert 1, from July 24, 2017 – September 27, 2017, the Bittrex accounts of E.S. and W.W. sent approximately 205.45 ETH through intermediary addresses to address 0xe02, where it was co-mingled with ETH from G.B.'s Poloniex Theft Attacker account and ETH from the Poloniex Manipulation Attack (*see* Item B).  From there, the ETH was routed to Karasavidi through intermediary address 0x899.

***Tracing Proceeds from the Poloniex Manipulation Attack to Karasavidi's Bitfinex Account***

51.      The USSS determined through blockchain analysis that proceeds from the Poloniex Manipulation Attack were transferred to Karasavidi in the same manner.  Insert 3 is a detail of the portion

of Insert 1 depicting the movement of those stolen funds.



a.     On November 7, 2017, approximately 763 ETH obtained from the Poloniex Manipulation Attack was transferred from addresses directly associated to the nine fictitious attacker accounts to one intermediary address, 0xb87

b.     Thereafter, on November 14, 2017, a portion of 0xb87's ETH was transferred through two intermediary addresses before being deposited into 0xe02 where (as noted above) it was co-mingled with ETH from Gurgen Bayalan's Poloniex Theft Attack account and with ETH from A.C., E.S. and W.W.'s Bittrex accounts. From there, as noted above, the contents of 0xe02 were routed to Karasavidi's Bitfinex account through intermediary addresses 0x271 and 0x899.

c.     A second portion of the ETH contained in address 0xb87 was routed to address 0x4f4 (through intermediary addresses 0xab, 0xb4a, and 0x927), and then emptied into Karasavidi's Bitfinex Account on March 11, 2018.

d.     The remainder of the contents of address 0xb87 was routed (through several intermediary addresses) into 0x899. There, it was co-mingled with ETH that had been transferred in substantially the same way from G.B.'s Poloniex Theft Attacker account, the Bittrex accounts of A.C., E.S. and W.W., and the Binance Theft Attack (discussed below), before being sent directly to Karasavidi's Bitfinex account.

### Tracing Proceeds from the Binance Theft Attack to Karasavidi's Bitfinex Account

52.     Proceeds from the Binance Theft Attack were routed to Karasavidi's Bitfinex account in a manner almost identical to the above-described transfers of proceeds from the Poloniex Theft Attack and the Poloniex Manipulation Attack. Insert 1 also graphically depicts the movement of the Binance Theft Attack proceeds.

a.     From January 8, 2018 – January 13, 2018, Binance Theft Attacker P.K. sent

approximately 1756.99 ETH to address 0x7f3.

b.   Three days later, address 0x7F3 emptied its entire contents of ETH into address 0x271, where (as discussed above) it was co-mingled with ETH from G.B.'s Poloniex Theft Attacker account, the Poloniex Manipulation Attack, and the Bittrex accounts of A.C., E.S. and W.W. before being sent directly to Karasavidi's Bitfinex Account.

### Tracing Proceeds from the Gemini Theft Attack to Karasavidi's Bitfinex Account

53.   Proceeds from the Gemini Theft Attack were routed to Karasavidi's Bitfinex account in a manner almost identical to the above-described transfers of proceeds from the other theft and manipulation attacks. Insert 4 graphically depicts the movement of funds stolen as a result of the Gemini Theft Attack to Karasavidi's Bitfinex account and, as seen above, illustrates Karasavidi's use of multiple or "layered" transactions to launder illegal proceeds as they were moved to his Bitfinex account.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



a.     Between October 24, 2017 and November 1, 2017, 728.01 ETH were transferred

from twenty-two Gemini victim accounts through eleven intermediary addresses,

where they remained until November 7, 2017 when they were transferred to

0xb87d (*see* Item C).

b.  On October 31, 2017, 1.1 ETH from one victim account was also transferred to 0xb87d (*see* Item B).

c.  As discussed above and depicted in Insert 3, between October 24, 2017 to November 1, 2017, 763 ETH stolen as a result of the Poloniex Manipulation Attack was also transferred through intermediary addresses, where (as seen previously) the funds remained until November 7, 2017 when they were also transferred to 0xb87d (*see* Item A).

d.  The stolen funds, totaling 1492.11 ETH, were intermingled in 0xb87d. They were then funneled through a number of intermediary addresses. In these intermediary addresses, an additional 1016.89 ETH from unknown sources was intermingled with the stolen funds. The total of 2509 ETH was then deposited into Karasavidi's Bitfinex account on March 11, 2018 (*see* Item D).

e.  On October 30, 2017, one of the twenty-three Gemini victims (Victim 1) also had 7.47 BTC stolen. That stolen BTC was transferred through two BTC clusters. In the first BTC cluster, the 7.47 BTC was intermingled with 2.38 BTC from unknown sources. The combined BTC was then moved to a second BTC cluster where it was intermingled with an additional 10.65 BTC from unknown sources. The total 20.5 BTC remained in the second cluster until November 25, 2017, when it was transferred to the T.E. Binance Account (*see* Item F).[12]

f.  On October 24, 2017, another one of the twenty-three Gemini victims (Victim 2) also had 3.008 BTC stolen. As with the BTC stolen from Victim 1, the BTC stolen from Victim 2 was moved through intermediary BTC clusters and co-mingled with

---

[12] The T.E. Binance Account is a fictitious account created in a manner similar to those at Poloniex. This account was used to receive the stolen BTC from Gemini and to convert it to ETH.

BTC from unknown sources before eventually being moved into the T.E. Binance account (*see* Item G).

g. The stolen funds were intermingled in the T.E. Binance Account and then converted to ETH. The converted funds were then funneled through a number of cryptocurrency addresses and eventually deposited into Karasavidi's Bitfinex account on April 9, 2018 (*see* Item E).

54. Characteristics of the transactions detailed in Inserts 1-4 above – the rapid transfer of funds, the movement of funds from the initial accounts through numerous intermediary addresses, and the co-mingling of stolen funds with other illicit funds and with funds of unknown origin – are examples of a money laundering technique known as "layering," in which the proceeds of illicit activity are moved through two or more levels of transactions and mingled with funds from other sources in an effort to conceal or disguise the nature, source, ownership, or control of the funds, and to make tracing the illicit funds more difficult.

55. On August 23, 2019, the Honorable Elizabeth D. Laporte, United States Magistrate Judge for the Northern District of California, authorized a seizure warrant for all funds contained Karasividi's Bitfinex Account (19-CR-71360 EDL). The warrant was executed on that date, resulting in the seizure by the USSS of the August 23, 2019 Funds.

56. On February 18, 2020, a federal grand jury in the Northern District of California returned a Superseding Indictment against Karasavidi and Potekhin charging them with Conspiracy to Commit Computer Fraud and Abuse in violation of 18 U.S.C. § 1030(b), Computer Fraud in violation of 18 U.S.C. § 1030(a)(4), Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349, Aggravated Identity Theft in violation of 18 U.S.C. § 1028A(a)(1), and Money Laundering Conspiracy in violation of 18 U.S.C. § 1056(h) (19-CR-0572 CRB). The Superseding Indictment contained a Computer Fraud Forfeiture Allegation, a Wire Fraud Forfeiture Allegation, and a Money Laundering Forfeiture

Allegation, all of which identified the Defendant Property as property for which the government is seeking forfeiture upon conviction of the identified offenses.

## **CLAIM FOR RELIEF**

1.     The United States incorporates by reference the allegations in paragraphs 1 through 56 as though fully set forth herein.

2.     Title 18, United States Code, 1030 makes it a crime knowingly (1) to exceed authorized access to a computer of a financial institution; (2) with the intent to defraud; (3) where such access furthered the fraud; and (4) the defendant obtained property worth more than $5,000.

3.     Title 18, United States Code, Section 1343, makes it a crime to knowingly execute, or attempt to execute a scheme or artifice to (1) obtain money or property by means of false or fraudulent pretenses, representations, or promises; (2) that are material; (3) with the intent to defraud; and (4) where the defendant used, or caused to be used, a wire communication to carry out or attempt to carry out an essential part of the scheme.

4.     Title 18, United States Code, Section 1344, makes it a crime knowingly to execute, or to attempt to execute, a scheme or artifice to (1) obtain money or property by means of false or fraudulent pretenses, representations, or promises; (2) knowing the statements were false; (3) where the statements were material; (4) the defendant acted with the intent to defraud; and (5) the victim was a financial institution.

5.     Title 18, United States Code, Section 1956(a)(1) makes it unlawful (1) to conduct or attempt to conduct a financial transaction; (2) with the proceeds of a specified unlawful activity; (3) knowing the transaction involved the proceeds of criminally derived property; (4) with the intent to promote the specified unlawful activity or to evade taxes, or knowing the transaction was designed to avoid reporting requirements or to conceal the nature, source, location, ownership, or control of those proceeds.

6.      Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1) provides for civil and criminal forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, 1957, or 1960, and any property traceable to such property.

7.      Title 18, United States Code, Sections 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting a "specified unlawful activity" or a conspiracy to commit such offense. Title 18, United States Code, Sections 1956(c)(7) and 1961(1) define specified unlawful activity to include computer hacking, bank fraud, and wire fraud, in violation of Title 18, United States Code, Sections 1030, 1343, and 1344.

8.      In light of the foregoing, and considering the totality of the circumstances, there is probable cause to believe that the Defendant Property represents proceeds traceable to computer hacking in violation 18 U.S.C. § 1030(a)(4), bank fraud in violation of 18 U.S.C. §1344, conspiracy in violation of 18 U.S.C. § 371, and wire fraud in violation of 18 U.S.C. §1343. As such, the Defendant Property is forfeitable pursuant to pursuant to 18 U.S.C. §§ 981(a)(l)(C) and 982(a). To the extent the Defendant Property includes funds that did not originate as proceeds from the illegal activities discussed herein, those fraud funds were "involved in" money laundering in violation of 18 U.S.C. § 1956 because they were comingled with and used to conceal and disguise the nature, location, source, ownership or control of the criminal proceeds. Accordingly, the Defendant Property is forfeitable pursuant to 18 U.S.C. §§ 981(a)(l)(A), 981(b), and 982(a).

WHEREFORE, plaintiff United States of America requests that due process issue to enforce the forfeiture of the Defendant Property; that notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; and that judgment of forfeiture be entered; that the Court

///

///

enter judgment forfeiting the Defendant Property; and that the United States be awarded such other relief as may be proper and just.

DATED: September 15, 2020                    Respectfully submitted,

                                            DAVID L. ANDERSON
                                            United States Attorney


                                            Karen D. Beausey
                                            Assistant United States Attorney

**VERIFICATION**

I, United States Secret Service Special Agent Andrew Foss, state as follows:

1.      I am a Special Agent with the United States Secret Service.  I am a case agent assigned to this case.  As such, I am familiar with the facts and the investigation leading to the filing of this Complaint for Forfeiture.

2.      I have read the Complaint and believe the allegations contained therein to be true.

                    *       *       *       *       *

I declare under penalty of perjury that the foregoing is true and correct.  Executed this <u>14th</u> day of September, 2020, in <u>San Francisco</u>, California.

_____

SA Andrew Foss
United States Secret Service

JS-CAND 44 (Rev. 07/19)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
AUSA Karen Beausey
450 Golden Gate Avenue, 9th Floor
San Francisco, CA 94102

## DEFENDANTS

A  Approximately 15,602 Ether (ETH) and 16 Bitcoin (BTC) seized by law enforcement on or about December 14, 2017, and
B  Approximately 199.718415608 BTC, $6,164,994.22 USD and 1199.00 NEO seized by law enforcement on or about August 23, 2019.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

× 1  U.S. Government Plaintiff

2  U.S. Government Defendant

3  Federal Question
*(U.S. Government Not a Party)*

4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | ×690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ | | | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 710 Fair Labor Standards Act | 820 Copyrights | 430 Banks and Banking |
| | 340 Marine | | 720 Labor/Management Relations | 830 Patent | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | 370 Other Fraud | 741 Family and Medical Leave Act | 840 Trademark | 470 Racketeer Influenced & Corrupt Organizations |
| | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 790 Other Labor Litigation | **SOCIAL SECURITY** | 480 Consumer Credit |
| 153 Recovery of Overpayment of Veteran's Benefits | 360 Other Personal Injury | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 362 Personal Injury -Medical Malpractice | 385 Property Damage Product Liability | **IMMIGRATION** | 862 Black Lung (923) | 490 Cable/Sat TV |
| 190 Other Contract | | | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 864 SSID Title XVI | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 865 RSI (405(g)) | 891 Agricultural Acts |
| | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| **REAL PROPERTY** | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 210 Land Condemnation | 443 Housing/ Accommodations | 530 General | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 220 Foreclosure | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 230 Rent Lease & Ejectment | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 240 Torts to Land | 448 Education | 540 Mandamus & Other | | | |
| 245 Tort Product Liability | | 550 Civil Rights | | | |
| 290 All Other Real Property | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

× 1  Original Proceeding

2  Removed from State Court

3  Remanded from Appellate Court

4  Reinstated or Reopened

5  Transferred from Another District *(specify)*

6  Multidistrict Litigation–Transfer

8  Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title 18, United States Code, Sections 981(a)(1)(A) and (C), 981(b), and 982(a)

Brief description of cause:
Conspiracy, Computer Hacking, Bank Fraud, Wire Fraud

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    Yes    × No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE

DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

*(Place an "X" in One Box Only)*    × SAN FRANCISCO/OAKLAND    SAN JOSE    EUREKA-MCKINLEYVILLE

DATE  09/15/2020

SIGNATURE OF ATTORNEY OF RECORD